FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2016 DEC -6 AM 9: 21

CLERK_____
SO. DIST. OF GA.

**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION**

IN THE MATTER OF:        *
                         *     MISC. NO. 115-006
VICTOR HAWK and      *
MELISSA DETCHEMENDY   *

## O R D E R

This Order is entered pursuant to Local Rule 83.5(g), S.D. Ga., as a resolution of this attorney disciplinary matter involving Victor Hawk and Melissa Detchemendy, attorneys admitted to practice law before this Court. An Order to Show Cause why Mr. Hawk and Ms. Detchemendy should not be disbarred, suspended, or otherwise disciplined in this Court was entered on September 3, 2015. The show cause hearing took place on October 14, 2015, in Augusta, Georgia, with the Honorable J. Randal Hall and the Honorable Dudley H. Bowen, Jr., presiding. The hearing was recessed to afford the Court the opportunity to review the trial transcripts of relevant witnesses in the criminal trial of Richard Lee Owen and to obtain financial records related to the law practice of Victor Hawk. Upon review of this evidence and upon consideration of

the testimony and evidence presented at the show cause hearing, the matter is resolved as follows.[1]

## I.   BACKGROUND[2]

This matter came to the Court's attention through the criminal indictment of Mr. Richard Lee Owen in this district. See United States v. Owen, Case No. 1:13-CR-117 (S.D. Ga. May 8, 2013).   Mr. Owen was charged with multiple counts of bank fraud and aggravated identity theft related to a scheme to embezzle settlement funds from the trust account of the Victor Hawk Law Firm (the "VHLF").   At all times relevant, Mr. Hawk was a partner and Ms. Detchemendy was an associate of the VHLF.

Mr. Hawk was admitted to practice law in Georgia in 1978 and admitted to this district's bar that same year.   Since that time, Mr. Hawk has practiced in the Augusta, Georgia area.   While criminal defense predominated his practice initially, at some point Mr. Hawk began shifting his work to personal injury such that by 2010 his civil caseload greatly outweighed his criminal caseload.   Mr. Hawk has appeared

---

[1]   The Court concludes that reconvening the show cause hearing is unnecessary.

[2]   Unless otherwise indicated, the facts are taken from the testimony and evidence presented at the show cause hearing and the records of this Court.

countless times before the undersigned judges on behalf of criminal defendants, both appointed and retained, and in several civil cases.

Ms. Detchemendy was admitted to practice law in Georgia in 2004 and became a member of this district's bar in 2009. She has appeared in this Court in 9 criminal cases and 2 civil cases.

### A. The Employment of Mr. Owen

In 2007, Mr. Hawk hired Mr. Owen as a paralegal. Prior to doing so, Mr. Hawk reviewed Mr. Owen's resume, interviewed him about his work experience and tested his proficiency in typing, computers, and paralegal matters. Mr. Hawk also called two attorney references, both of whom gave Mr. Owen high recommendations. Mr. Hawk did not run a background check or perform any internet-based research on Mr. Owen. Mr. Hawk was therefore unaware that Mr. Owen had been convicted of several felonies, including the transportation of stolen vehicles, burglary, forgery in the first degree, theft by deception, and theft by conversion.[3] (See Presentence Investigation Report ("PSIR") of Richard Lee Owen, at 11-14.)

---

[3] In addition to these crimes, Mr. Owen was arrested for and convicted by a jury of shooting a police officer during a routine investigative traffic stop in the 1970s. The conviction was later reversed. (See Owen PSIR at 15.)

Mr. Owen was given access to the law firm's trust account checkbook and the signature stamp of Mr. Hawk. He was charged with the responsibility of preparing the settlement disbursement sheets for the personal injury cases settled by the VHLF. Mr. Owen answered the phone calls of clients and met with clients. He also had unfettered access to client files. With this access and freedom, and over a period of time between January 2009 and July 2012, Mr. Owen was able to embezzle $594,730.88 from the law firm using various artifices and schemes.[4] (See Owen PSIR at 7.) His fraud involved over 50 clients. (Id.) The embezzlement and fraud went undetected by Mr. Hawk and Ms. Detchemendy.

In July 2012, Mr. Hawk learned that Mr. Owen had charged an elderly client $18,000 for work that was supposed to be done as a favor from the law firm to the client. According to Mr. Hawk, Mr. Owen was immediately fired.

**B. Discovery of the Fraud and Embezzlement**

Within six weeks of Mr. Owen's termination, Mr. Hawk began receiving telephone calls from clients and medical providers regarding unpaid medical bills even though the disbursement sheets indicated that the medical bills had been

---

[4]  The PSIR indicates that $514,480.17 was fraudulently removed from the law firm's trust account by Mr. Owen. The balance was diverted from the VHLF's expense account. (Owen PSIR at 7-8.)

paid. Two months later, in November 2012, Mr. Hawk ordered the complete trust account statements from the bank. The monthly bank statements he had previously received had not included photocopies of the backs of the checks. Upon receiving the full statements, Mr. Hawk noticed anomalies such as checks deposited into Mr. Owen's bank account and forged client signatures. Mr. Hawk immediately contacted the Federal Bureau of Investigation.

In the months of investigation to follow, Mr. Hawk and Ms. Detchemendy fully cooperated with the FBI and the United States Attorney's Office. Meanwhile, Mr. Hawk notified his malpractice carrier and pursued legal remedies against the banks involved in the fraudulent transactions. According to Mr. Hawk, he began making restitution to some of the more vulnerable clients.

C.   **The Criminal Case**

The original indictment against Mr. Owen was returned on May 8, 2013, containing 15 counts of bank fraud and 15 counts of aggravated identity theft. (United States v. Owen, Case No. 1:13-CR-117, Doc. No. 1.) On January 6, 2015, the grand jury returned a 253-count third superseding indictment. (Id., Doc. No. 129.) Judge Bowen presided over the criminal case. After the vacation of three separate trial dates, a jury was

selected on March 9, 2015. Mr. Owen was permitted to represent himself.

The Government presented 29 witnesses, 13 of whom were former clients of the VHLF. On the evening of the second day of trial, Mr. Owen pleaded guilty to two counts of the indictment. The Court has now had the benefit of reviewing the transcripts of the client-victims, all of whom received less money than what they were entitled to from their settlements because of Mr. Owen's fraud and deceit. With respect to their interactions with the VHLF, the relevant testimony is as follows:

- *James Claypool*

Mr. Claypool injured his arm as a result of a slip and fall while visiting a nursing home. (Trial Tr.[5] at 4-5.) While he initially spoke with Mr. Hawk about a possible lawsuit, he worked primarily with Mr. Owen and discussed the possible outcome of his case with Mr. Owen. (<u>Id.</u> at 5-6.) Mr. Claypool testified that Mr. Owen was "obnoxious" and "very short" with him. (<u>Id.</u> at 6.) When Mr. Claypool called the office to inquire about his case, Mr. Owen told him not to call and that Mr. Owen would call him. (<u>Id.</u>)

---

[5] The trial transcript appears in the record of the Owen criminal case, Case No. 1:13-CR-117, doc. no. 233.

6

After settlement of his claim, Mr. Claypool inquired of Mr. Owen why his check was less than he had expected. Mr. Owen contrived a story that the insurance company blamed his arm injury on Mr. Claypool's avid golf. Mr. Claypool, however, had only played golf less than ten times in his life. (Id. at 9-10.)

- *Robert Keenum*

Mr. Keenum's son was killed as a result of a car accident. (Id. at 12.) He sought Mr. Hawk's help in filing insurance claims because his son had incurred significant medical bills in the days after his accident. (Id. at 12-13.) Mr. Keenum had numerous phone calls and e-mails with Mr. Owen. (Id. at 13.) Sometimes, however, Mr. Keenum's e-mails would go unanswered until he mentioned the problem to Mr. Hawk. (Id.)

- *Joanne Freeman*

Ms. Freeman was in a car accident and had incurred medical bills. (Id. at 20-21.) She dealt primarily with Mr. Owen at the VHLF but he was "difficult to get along with." (Id. at 21.) Ms. Freeman testified that Mr. Owen had a "very hostile" attitude toward her and did not want her to call the office. (Id.)

At some point, the insurance company mailed Ms. Freeman a letter explaining that her claim had been paid a week

earlier. When Ms. Freeman inquired about this letter of Mr. Owen, Mr. Owen complained that the insurance company should not have contacted her and then claimed not to know anything about payment of her claim. (Id. at 21-22.)

- *Barbara Hammonds*

Ms. Hammonds was injured at her place of employment. (Id. at 27.) She worked with Mr. Owen at the VHLF on matters pertaining to her case. (Id. at 28.) When explaining what she did when she received a settlement check, she stated that she called "my attorney which is Rick Owens (sic)." (Id.) She further explained that Mr. Owen told her to bring the check down to *his* office. When she arrived, she showed the check to the receptionist, who took the check and called Mr. Owen to let him know she had it. Ms. Hammonds left the check with the receptionist at that time. (Id. at 28-29.)

When Ms. Hammonds called Mr. Owen later to inquire about the check, Mr. Owen told her that *he* decided whether the check was sufficient and that he was sending it back and waiting for another check. (Id. at 29.)

Finally, Ms. Hammonds revealed that she discussed the issue of attorney's fees with Mr. Owen and ultimately, she gave Mr. Owen a money order to pay those fees. (Id. at 30-31.)

- *Norma Hall*

Ms. Hall was in a car accident with her daughter. (*Id.* at 33.) She testified that Mr. Owen initially came to her house to meet with her to ascertain the extent of her injuries and to get her information. She stated that Mr. Owen was the only one at the VHLF that she dealt with. (*Id.* at 33-34.)

- *Joseph Hall*

Mr. Hall was in a car accident and dealt with Mr. Owen at the VHLF. (*Id.* at 39.) Mr. Hall testified that Mr. Owen spoke to the insurance adjusters but it was difficult to get answers from Mr. Owen about his case. When Mr. Hall inquired of Mr. Owen about his case, Mr. Owen would respond with "I will let you know" and "I am working on it." (*Id.* at 39-40.)

- *Brenda Barrette*

Ms. Barrette fell off a pool ladder and injured her hip. She required 13 surgeries. (*Id.* at 44-45.) She hired Mr. Hawk, who sent Mr. Owen to her house for the initial consultation which included discussion about attorney's fees. (*Id.* at 46.) Mr. Owen assured Ms. Barrette that her medical bills would be paid and anything left over would be held in trust for her future medical needs. (*Id.*)

Upon settlement, Ms. Barrette testified that the attorney's fee came out first and then she was given a list of medical bills that had been paid. (*Id.* at 47-48.) However,

9

she continued to get bills from her "paid" providers. Mr. Owen originally told Ms. Barrette to send the bills to him, but eventually he stopped returning her calls. Ms. Barrette started paying the medical bills with her retirement money. (Id. at 48-49.) Ms. Barrette later determined that none of the medical providers on the disbursement sheet had been paid. (Id. at 55.)

- *Susan Izbicki*

Ms. Izbicki hired the VHLF to represent her with regard to her car accident. (Id. at 62.) Upon settlement of her claim, Mr. Owen reviewed the disbursement of the settlement proceeds with Ms. Izbicki. (Id. at 63.)

- *James E. Edwards*

Mr. Edwards hired the VHLF following his car accident and dealt with Mr. Owen. (Id. at 73.) When asked about his dealing with Mr. Owen, Mr. Edwards said: "You know, he had the case for about a year, and you know, hey, I sparred with him, right, and then it was a settlement, right, but he told me it wasn't enough money; so, I said, 'Okay, then,' but then when I come back to see him later, right, he was no longer at the firm." (Id. at 73-74.)

---

Ms. Detchemendy also testified at Mr. Owen's trial prior to the entry of his guilty plea. Ms. Detchemendy notably

testified as follows: Mr. Owen was hired to be a paralegal, but he moved into the role of office manager. She and Mr. Hawk determined that Mr. Owen was very good at resolving matters with adjusters and medical providers. (Id. at 100-01.) Mr. Owen negotiated medical liens on behalf of clients. (Id. at 104.) Mr. Owen prepared the disbursement sheets for cases, upon which she and Mr. Hawk "absolutely relied." (Id. at 110-11.) Mr. Owen would prepare a disbursement sheet for approval and then write the checks reflected on the sheet. (Id. at 103.) There was a signature stamp for Mr. Hawk in the office, and Mr. Owen had access to the signature stamp and the trust account checkbook. (Id. at 98, 102.)

Mr. Owen usually got the mail and often fielded calls from clients. (Id. at 112.) In fact, he insisted upon answering the office phones sometimes against Ms. Detchemendy's directions. (Id. at 114.) Ms. Detchemendy learned that Mr. Owen was rude to clients and instructed Mr. Owen not to be alone with clients. (Id. at 115 ("We did not want him around clients because he was just rude to them. So, that was a practice in our office was to keep [Mr. Owen] away from clients if we could.").)

Ms. Detchemendy also testified that Mr. Hawk handled the trust account bank statements, yet she testified that the statements did not include photocopies of the backs of the

checks and that she noticed a steady drop in the trust account. (Id. at 99, 117, 152.) She testified that she assumed the money as reflected on the front of the checks was going to the clients. (Id. at 128.) She testified that she looked for the bank statements after Mr. Owen's termination, but they were gone. (Id. at 117.)

### D. The Sentencing Proceeding

On June 12, 2015, Mr. Owen appeared before Judge Bowen for sentencing. Mr. Hawk testified at this time.[6] With respect to the missing funds in the firm's trust account, Mr. Hawk stated that the attorneys had "righted the ship as best we can" and moved on from the incident. (Sent'g Tr. at 3.) He also testified that he was not concerned about his losses but wanted to make restitution to the client-victims by using his own money and any recovery from his business liability insurance. (Id. at 3-4.) He testified that they had made "good progress" in restitution and hoped to have it all resolved in the next year or two. (Id. at 4.) He expressed that he would work diligently to make his clients whole again. (Id. at 5.)

At the conclusion of the hearing, Mr. Owen was sentenced to serve 236 months of imprisonment on each count to be served

---

[6] The relevant portion of the sentencing transcript appears in the record of the Owen criminal case, Case No. 1:13-CR-117, doc. no. 234.

concurrently. The matter of final restitution was deferred until the completion of an audit. To that end, the Court appointed Mr. James T. Wilson, Jr., of Augusta, Georgia to audit available materials and information to determine the extent of losses suffered but still unpaid to the individual client-victims of the VHLF. Mr. Wilson submitted an interim and final report of his findings to the Court. The final report, dated September 1, 2015, concluded that at least $192,899.95 was still owed to client-victims from the conduct of Mr. Owen.[7]

### E. Attorney Disciplinary Proceedings

On September 3, 2015, this Court entered the Show Cause Order initiating this disciplinary matter. Of foremost concern to the Court, and as announced in the Show Cause Order, is the apparent "level of negligence or even deliberate indifference" on the part of the subject attorneys in allowing, however unwittingly, the fraud to be perpetrated against hapless client-victims, who at the time of the Show Cause Order were still owed $192,899.95. (See Doc. No. 1, at 3.)

The disciplinary matter first came before the Court for a hearing on October 14, 2015. In addition to the testimony

---

[7] Mr. Wilson's final report was admitted as Exhibit 11 at the show cause hearing.

of Mr. Hawk, the attorneys presented the testimony of three expert witnesses, which the Court summarizes here.

- *Patrick E. Longan*

Patrick E. Longan holds the William Augustus Bootle Chair in Ethics and Professionalism in the Practice of Law at the Walter F. George School of Law, Mercer University, Macon, Georgia. He is also Director of the Mercer Center for Legal Ethics and Professionalism and serves on the Georgia State Bar's Disciplinary Rules and Procedures Committee and Formal Advisory Opinion Board. Professor Longan was qualified as an expert in the field of legal ethics and professionalism.[8]

In undertaking a review of this matter, Professor Longan reviewed the Show Cause Order, the Order of October 6, 2015, (which had listed four analogous disciplinary cases (doc. no. 2)),[9] and the criminal case of Richard Lee Owen. He reviewed the ABA Standards for Imposing Lawyer Sanctions and the cases cited therein and the Model Rules of Professional Conduct and

---

[8] Professor Longan's *curriculum vita* was admitted as Exhibit 12 at the show cause hearing.

[9] Prior to the show cause hearing, the Court identified the following four disciplinary cases to give the attorneys guidance regarding the Court's concerns: Attorney Grievance Comm'n of Maryland v. Smith, 116 A.3d 977 (Md. Ct. App. 2015); The Florida Bar v. Rousso, 117 So.3d 756 (Fla. 2013); In re: John T. Bennett, 32 So.3d 793 (La. 2010); and State of Oklahoma, ex rel. Oklahoma Bar Ass'n v. Mayes, 977 P.2d 1073 (Okla. 1999).

cases cited therein.  He also interviewed the subject attorneys.

Based upon the facts as he had derived them from his review and the attorney interviews, Professor Longan set about distinguishing the four disciplinary cases noted in the Order of October 6, 2015.  Upon examination by the Court, however, it was revealed that Professor Longan was unaware of certain facts such as the Victor Hawk signature stamp and Mr. Owen's criminal history.  Professor Longan referred to a "timely" and full restitution, although it had been nearly three years from the time of discovery until the hearing, and only then had restitution been made in full.[10]  Professor Longan had not reviewed the criminal trial transcript and therefore was unaware of the client-victims' testimony respecting the rude and hostile manner in which Mr. Owen treated them.

Professor Longan then explained the process or methodology by which the ABA Rules of Professional Conduct's Standards for Imposing Lawyer Sanctions determines sanctions to be imposed against attorneys for ethical violations.  He testified that this methodology is used by the Georgia Supreme Court.  This methodology and Professor Longan's opinions and

---

[10]    The attorneys presented Exhibits 3 and 4, which summarize the restitution efforts of the VHLF to 53 client-victims.  These exhibits are discussed in greater detail _infra_ through the testimony of an accountant, John Douglass Cates IV.

observations relevant to the instant case will be discussed
infra.

- *John Douglass Cates IV*

With over 35 years of experience as a certified public
accountant, Mr. Cates was qualified as an expert in
accounting.[11] Mr. Cates was hired to audit Exhibits 3 and 4,
which he explained in some detail at the hearing.

Exhibit 4 is a three-ring binder containing documents
purporting to demonstrate the allocation of settlement funds
between legal fees, lien holder payments, and ultimately
payments to the client-victims of the VHLF. The notebook is
arranged alphabetically by client name and contains 53 names,
which were provided to the VHLF by the FBI. Behind each
client-victim's allocation summary, the notebook contains
disbursement sheets, cancelled checks and/or other computer
data entries showing what monies were received and what
payments were made with respect to each client.[12] Mr. Cates
explained that as part of the process of ensuring the
settlement funds were properly distributed, the VHLF compared
what was actually paid from its trust account to what should
have been paid. Once this comparison was made, the VHLF made

---

[11] Mr. Cates's *curriculum vita* was admitted as Exhibit
14 at the show cause hearing.

[12] None of the disbursement sheets are executed by the
client-victims.

payments from its expense account to either the lien holders or the clients for the amounts that had not been paid.[13]

Exhibit 3 then lists the checks that are highlighted in yellow in Exhibit 4 and thereby summarizes the payments made by the VHLF after the Owen theft was discovered. The checks were paid either to individual client-victims or to their lien holders from the summer of 2012 to present.[14] It shows the total amount of restitution from the VHLF to clients and lien holders to be $311,678.92.[15]

Mr. Cates explained that his audit was premised upon three assumptions: (1) that the total settlement amount is correct; (2) that the 53 person pool is the universe of client-victims; and (3) that the payees noted on the copies of checks actually received the money.

------

[13] The checks paid either to a client or a lien holder after the Owen theft was discovered are highlighted in yellow. The Court notes that attorney's fees had been paid in full with respect to every client upon receipt of the settlement proceeds and are therefore not highlighted.

[14] Mr. Cates noted that there are checks for four clients being held pending final resolution of lienholder claims. Also, there are six people on the list whose checks are being held by counsel pending their location. Following the show cause hearing, the Court received a letter from counsel with an addendum to Exhibit 4 and an explanation that all liens had been paid for all client-victims and the remaining money had been distributed to the client-victims except two individuals who had not been located.

[15] Mr. Cates stated that the ultimate amount of restitution is within 5% of this figure taking into account a few exceptions to final payment noted in footnote 14 supra.

In conclusion, and noting the assumptions upon which he relied, Mr. Cates opined that the VHLF has made full restitution to the client-victims identified by the FBI and their lienholders.

Upon examination of Exhibit 3, the Court makes some additional observations. First, 58% of all monies paid to client-victims after the Owen theft was discovered was not paid until after the entry of the Show Cause Order. More particularly, of the $242,865.33 paid to clients after the Owen theft was discovered, $140,743.03 was paid on or after September 3, 2015. Also, between the time of discovery and the indictment of Richard Lee Owen on May 8, 2013, the VHLF had made only $27,562.66 in restitution payments to its client-victims. From indictment until the time of trial on March 9, 2015, a twenty-two month period, $51,750.64 had been made in restitution payments but that was to only three client-victims.[16] Finally, from the time of Mr. Owen's sentencing proceeding on June 12, 2015, a point in time that Mr. Hawk testified he got the clear message from Judge Bowen that restitution could not wait, until the Show Cause Order was entered on September 3, 2015, only $5000 was paid to one client.

_____

[16] 36 of the 53 identified client-victims received some money after the Owen theft was discovered.

- *Harry Duff Revell, Esq.*

Mr. Revell has practiced as a plaintiff's personal injury lawyer since 1987. He was admitted to practice in this district's bar in 1988. Mr. Revell was qualified as an expert in the field of personal injury law.[17]

In preparation for the hearing, Mr. Revell reviewed case summaries of the client-victims that were collected in Exhibit 5, which was presumably prepared by the VHLF or its counsel. The summaries included demand letters and disbursement sheets. Mr. Revell first explained the factors that he considers in valuating a personal injury case. He then explained the difficulties in identifying medical liens and ensuring that these claims are properly negotiated and satisfied.

In light of these recognized factors and the inherent risks and difficulties in personal injury cases, Mr. Revell reviewed the case summaries to determine whether resolution of the cases was fair and appropriate. Mr. Revell ultimately opined that upon his review, he found the cases to have been handled appropriately, the demands in the cases appropriate, the liens properly identified and satisfied, the attorney's fees reasonable, and the clients' recoveries within the norm.

---

[17] Mr. Revell's *curriculum vita* was admitted as Exhibit 13 at the show cause hearing.

Upon questioning by the Court, Mr. Revell conceded that a five-year turnaround between the date of settlement and final disbursement to the client is unreasonable.[18]  In fact, a typical time period between settlement and complete disbursement to both the lien holders and the client is three to nine months, with the latter usually involving Medicare liens.  Mr. Revell also testified that clients frequently call or visit his office to inquire about their cases and that he personally speaks to them or visits with them.  Finally, he testified that no one in the firm other than himself and his law partner is authorized to write checks on the firm's expense and trust accounts.

- *Victor Hawk*

After detailing his professional background and the facts surrounding the hire of Mr. Owen, which are related supra, Mr. Hawk testified that Mr. Owen was not given authority to act on behalf of him, but instead was only a conduit of information from Mr. Hawk to either the insurance companies or the clients.  Mr. Owen was permitted to negotiate liens with medical providers but all resolutions had to be approved by the lawyers.  Mr. Owen did not draft or file pleadings.  Mr. Owen did not have settlement authority, and he could not

---

[18]  This was the turnaround time with respect to client-victim Billy Reynolds.

20

obtain consent from the clients to settle. Mr. Owen was not allowed to advise clients on the propriety of settling their claims. Mr. Hawk admitted that a couple of clients had their cases settled and checks disbursed by Mr. Owen without an attorney present.

Mr. Hawk testified that every client has the attorneys' cell phone numbers and are encouraged to call them personally if there is a need or problem. Yet, none of the 53 client-victims ever contacted Mr. Hawk personally about the length of time it took to get their money. Mr. Hawk testified that he never learned of Mr. Owen's rudeness to clients personally, but Ms. Detchemendy had informed Mr. Hawk that he had been rude and she had counseled him about it. Generally speaking, Mr. Hawk emphasized to all employees to be nice to clients.

Mr. Hawk testified that he opened the monthly trust account statements and neither Ms. Detchemendy nor Mr. Owen had authority to do so. Mr. Hawk also testified that at all relevant times, Ms. Detchemendy was a lawyer employee of the firm, not a partner, and that he alone had direct managerial and supervisory authority over Mr. Owen.

Mr. Hawk explained that it was the firm's practice to obtain signed fee contracts and to retain executed disbursement sheets; however, on April 3, 2013, the firm's computer system crashed and they lost files that had been

digitally scanned into the computer. This crash hampered the firm's ability to produce these executed documents and its ability to put together the settlements and payments of many cases. The crash did not affect the notes portion of the system, in which the settlement demand letters were retained.

Mr. Hawk testified that during the time period that Mr. Owen was employed by the firm, the trust account balance was never "out of balance." Mr. Hawk periodically reviewed the monthly bank statements and disbursement sheets. Mr. Owen never made a check payable to himself; rather, Mr. Hawk only saw checks written to medical providers and clients and assumed that was where the checks were going. Mr. Hawk never received information that lien holders and/or clients had not been paid until after Mr. Owen was fired. Mr. Hawk admits that Mr. Owen was permitted to use his signature stamp but only after the disbursement sheets had been approved.

With respect to restitution, Mr. Hawk testified that it was paid out of the firm's expense account, not its trust account. There was never any commingling of funds. Mr. Hawk testified that the process has been difficult because of the different ways that Mr. Owen perpetrated his fraud and the loss of files, including information about liens and the location of clients. He explained that through 2013 and 2014 and even as late as the Owen trial, he was in communication

with the government trying to ascertain whether a check was legitimately negotiated. Even with the benefit of trial evidence and an audit, the amounts owed to clients were wrong either as to the amount owed or to whom it was owed.

Mr. Hawk testified that he was always hopeful that money would be recovered from Mr. Owen, particularly the valuable coins that Mr. Owen had purchased with embezzled funds. This did not occur. To obtain funds to make restitution, Mr. Hawk "saved the money" over time by putting aside attorney's fees coming in rather than paying the firm's attorneys. Mr. Hawk also sought to recover from banks money that had been paid on checks over forged endorsements. He received $50,000 in settlement from one bank in August 2015, and at that time, he had saved enough money to make final restitution to the client-victims.[19] Mr. Hawk made some payments to clients along the way based upon need,[20] but he had to take the time to figure out how much money was available in order to even negotiate the liens. Also, he risked personal exposure on certain liens if they were not adequately resolved.

---

[19] Mr. Hawk also received $15,000 from his liability carrier, which he sent to client-victim Brenda Barrette.

[20] For instance, Mr. Hawk made 14 separate $2000 payments to Billy Reynolds in the one year period from March 2013 to April 2014. Ultimately, Mr. Reynolds was paid a final amount of $23,293.56 on October 8, 2015, five years after his settlement.

Upon the Court's questioning Mr. Hawk's seemingly late recognition of his responsibility to make full restitution, Mr. Hawk stated that he had been inarticulate at the sentencing hearing in expressing his efforts at restitution. He further stated that Judge Bowen had made it very clear to him at the sentencing hearing that the clients should not be made to wait upon Mr. Hawk's attempts to recover money from other sources. He acted quickly thereafter to accomplish that and was in the process of negotiating liens and paying the difference to the clients when the Show Cause Order was entered. In hindsight, Mr. Hawk "could have done a better job . . . but the way he did it [he] thought was the right way to do it." Upon further inquiry, Mr. Hawk revealed that the VHLF grossed $1.9 million in 2013. The 53 client-victims were only 6% of the firm's personal injury cases at the time and 3% of all of the firm's clients.

## II. LEGAL STANDARDS

The standard of professional conduct of attorneys admitted to practice in this district is governed first by the Georgia Bar Rules of Professional Conduct. Loc. R. 83.5(d), S.D. Ga. Here, the Court focuses upon the following Rules:

**Rule 5.3  <u>Responsibilities   Regarding Nonlawyer</u>**
**<u>Assistants</u>**

With  respect  to  a  nonlawyer  employed  or
retained by or associated with a lawyer:

> (a)  a  partner  in  a  law  firm  shall  make
> reasonable  efforts  to  ensure  that  the
> firm  has  in  effect  measures  giving
> reasonable assurances that the person's
> conduct   is   compatible   with   the
> professional obligations of the lawyer;
> [and]

> (b)  a  lawyer  having  direct  supervisory
> authority over the nonlawyer shall make
> reasonable  efforts  to  ensure  that  the
> person's conduct is compatible with the
> professional obligations of the lawyer.

. . . .

The  maximum  penalty  for  a  violation  of  this
Rule is disbarment.

Rule 5.3 of the Georgia Rules of Professional Conduct, <u>see</u> Bar

Rule 4-102(d).  Paragraph (a) requires lawyers with managerial

authority within a law firm to make reasonable efforts to

ensure that a nonlawyer employee in the firm acts in a way

compatible with the professional rules.  Paragraph (b) imposes

the same obligation upon attorneys who supervise the work of

the nonlawyer.

**Rule 1.15(I) - <u>Safekeeping Property - General</u>**

. . . .

> (b)  Upon receiving funds or other property in
> which  a  client  or  third  person  has  an
> interest, a lawyer shall promptly notify
> the client or third person.  Except as
> stated  in  this  rule  or  otherwise

permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

. . . .

The maximum penalty for a violation of this Rule is disbarment.

Rule 1.15(I) of the Georgia Rules of Professional Conduct, <u>see</u> Bar Rule 4-102(d).

In this case, it is undisputed that a nonlawyer, Richard Lee Owen, embezzled over $500,000 from the VHLF's trust account over a three-year period. The issue before the Court then is whether either Mr. Hawk's or Ms. Detchemendy's conduct as it relates to Mr. Owen violates the Rules of Professional Conduct.

Importantly, Rule 5.3 does not require that an attorney be aware of his or her assistant's misconduct because violations of this rule rest on the lawyer's supervisory failures, not upon participation in or knowledge of the assistant's misconduct. Thus, a lawyer may violate Rule 5.3 through negligent supervision. <u>See, e.g.</u>, <u>In re Geiger</u>, 27 So. 3d 285; <u>In re Mopsik</u>, 902 So. 2d 991 (La. 2005); <u>In re Craig</u>, 454 S.E.2d 314 (S.C. 1995) To be clear, a lawyer's supervisory liability under Rule 5.3 is not vicarious or

26

imposed upon a lawyer based simply upon the relationship between lawyer and nonlawyer. See In re Phillips, 244 P.3d 549 (Ariz. 2010); see Iowa Sup. Ct. Att'y Disciplinary Bd. v. Dunahoo, 799 N.W.2d 524, 534 (Iowa 2011) (finding no Iowa Rule 5.3(b) violation where assistant's mistake "was not a direct consequence of inattentive instruction or supervision" by the lawyer). Rather, Rule 5.3 imposes an independent duty to supervise, and liability is imposed when that supervision fails.

## A. Victor Hawk

With respect to Mr. Hawk, the Court readily finds by the clear and convincing evidence as set forth above that his supervision of Mr. Owen failed and that Mr. Hawk has therefore violated Rule 5.3(a) and (b). As one court has aptly put it:

> The sin in this case was inattention - inattention to clients, inattention to an attorney trust account, and inattention to the activities of a non-lawyer assistant in whom the attorney misplaced his trust and who misused the attorney trust account to the detriment of the attorney's clients. . . . [O]ur regulation of the practice of law must protect the public not only from those attorneys who engage in deliberate, egregious acts of misconduct, but also those who fail to fulfill the routine duties of the profession that serve and safeguard their clients.

Att'y Grievance Comm'n of Md. v. Smith, 116 A.3d 977, 978 (Md. Ct. App. 2015).

While Mr. Hawk's proffered expert, Professor Longan, acknowledged that Rule 5.3 has been violated, the Court will

iterate the facts that warrant this conclusion in summary fashion. Mr. Hawk managed a law firm in his own name and delegated many of his responsibilities to Mr. Owen with little oversight. This included meeting with and exclusively dealing with clients, negotiating with medical providers, communicating with clients and insurance companies, and preparing disbursement sheets for and explaining the settlement process to clients. Mr. Hawk allowed his signature to be placed upon expense and trust account checks via a rubber stamp. He failed to discover Mr. Owen's conduct because he failed to thoroughly scrutinize and audit his trust account. In other words, Mr. Hawk failed to have reasonable measures in place to ensure that the checks coming out of his trust account had been properly negotiated. Also, Mr. Hawk either negligently failed to recognize Mr. Owen's contrivances in fielding calls and emails from clients and acting hostilely toward them or he turned a blind eye to it for the sake of convenience. In this regard, Mr. Hawk's claim that he knew nothing of Mr. Owen's rude and boorish behavior is belied by Ms. Detchemendy's testimony that it was the practice of the office to keep Mr. Owen away from clients. In any event, this fact demonstrates an utter lack of supervision over Mr. Owen's conduct. While Mr. Hawk may not have been aware of the

embezzlement at the time, he is culpable for the broad grant of authority and complete autonomy he gave to Mr. Owen.

In a similar case, the Supreme Court of Florida stated that lawyers have a "'unique fiduciary duty'" in that "'[n]ever is an individual's trust in attorneys more evident, or more at risk, than when he places funds or property into the hands of his attorney.'" <u>Florida Bar v. Rousso</u>, 117 So. 3d 756, 767 (Fla. 2013) (quoting <u>Florida Bar v. Watson</u>, 76 So. 3d 915, 823 (Fla. 2011)). In finding that the attorneys in <u>Rousso</u> had failed to effectively monitor their employee or their trust account, the Supreme Court of Florida concluded that the attorneys had abandoned their professional duty to safeguard their clients' funds. <u>Id.</u> In this case, 53 clients placed their money and their trust into the hands of Mr. Hawk, and he failed to safeguard both of them through his lack of supervision of Mr. Owen.

In addition to Rule 5.3(a) and (b), the Court finds that Mr. Hawk's conduct led to a violation of Rule 1.15(I)(b) in that he failed to "promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive . . . ." As case in point, it took five years for Billy Reynolds to receive the full and final funds from the settlement of his case. He is not alone. Summary Exhibit 3 shows that many of the 53 client-victims

(and lien holders alike) did not receive full and final distribution of settlement funds for years after settlement. As will be discussed further in mitigation, while this violation was initially caused solely by Mr. Owen's embezzlement, the length of delay is due in part to Mr. Hawk's failure to make timely restitution.

Mr. Hawk does not forcefully dispute these findings but he urges his continued competence to practice law in this Court and his desire to do so. He also points to certain factors in mitigation to be considered in meting out this Court's disciplinary response.

Professor Longan offered guidance to the Court in its decision-making. He explained that the ABA's Standards for Imposing Lawyer Sanctions sets forth a framework that this Court should follow in leveling an appropriate sanction. Upon his representation, because this is the methodology used by the Georgia Supreme Court, this Court will likewise utilize the ABA's Standards.

Under the Standards, there are four questions to consider when determining the appropriate sanction for an ethical violation:

(1) What ethical duty was violated?

(2) What was the lawyer's mental state?

(3) What was the extent of the actual or potential injury caused by the misconduct?

(4) Are any aggravating or mitigating factors present? See ABA Standards for Imposing Lawyer Sanctions, Chapter III.C., § 3.0. The first three questions allow for the categorization of the misconduct and identification of the appropriate sanction. Then, the presence of aggravating or mitigating factors may lead to a sanction different from that which is recommended. Id., Chapter I.B, *Methodology*; see also id., Chapter II, *Theoretical Framework* ("The ultimate sanction imposed will depend on the presence of any aggravating or mitigating factors in that particular situation.")

The first question has already been answered. The Court finds that Mr. Hawk has violated Rules 1.15(I)(b) and 5.3(a) and (b) of the Georgia Rules of Professional Conduct. Moreover, the third question, the potential or actual harm, is easily answered. There is no doubt that the monetary harm to clients and lien holders was considerable. The harm also extends to the financial well-being and reputation of the VHLF's attorneys.

The second question as to the attorney's state of mind is, in the estimation of Professor Longan, crucial in this case because the sanction to be imposed depends upon the lawyer's culpability. Standard 4.13 calls for reprimand "when

31

a lawyer is negligent in dealing with client property and causes injury or potential injury to a client." Under Standard 4.12, a suspension is appropriate "when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client." Finally, a disbarment is warranted under Standard 4.11 "when a lawyer knowingly converts client property and causes injury or potential injury to a client."

Professor Longan opined that Mr. Hawk's conduct did not rise above the level of negligence because there were no red flags to warn of Mr. Owen's embezzlement. The problem with this opinion, however, is that a lawyer's supervision may be so lax that he does not see the red flags. Standard 4.12 uses the language "knows or *should know*" of misdealings with client property. Here, while Mr. Hawk testified that his trust account was never "out of balance," that is not to say that there were not red flags available to Mr. Hawk in the trust account had he diligently safeguarded it. The Court is also troubled by the juxtaposition of Mr. Revell's testimony that his office constantly receives calls and visits from clients inquiring about their money with Mr. Hawk's testimony that his office was very quiet and he had no complaints. This could be explained in part by the fact that Mr. Owen received the mail

and insisted upon answering the phone calls.[21] There are also inferences to be drawn from the testimony of client-victims that they dealt *exclusively* with Mr. Owen or thought he was their attorney. Even the receptionist at the VHLF called Mr. Owen when a client brought a check to the office to inquire what to do with it. (See Testimony of Barbara Hammonds, supra.) This shows that Mr. Owen had pervasive authority in the firm. Further, the very fact that Mr. Hawk had rubber stamps in the office for the staff's use indicates that he was not as present as he could have been. In short, Mr. Hawk did not appear to have a finger on the pulse of his law firm, so the absence of red flags rings hollow.

In conclusion, Mr. Hawk is not entirely exempt from the "knowing" inquiry because his failure to supervise contributed to the lack of knowledge of Mr. Owen's conduct. Accordingly, this Court finds that Mr. Hawk's violation rises above mere negligence and at the very least, he was grossly negligent and even deliberately indifferent in supervising Mr. Owen.

The Court now turns to the mitigating and aggravating circumstances that will play a part in its decision. The following mitigating factors weigh in Mr. Hawk's favor, all of which are listed in Standard 9.3 of the Standards for Imposing

---

[21] At least one client, a personal friend of Mr. Hawk's, alerted Mr. Hawk that Mr. Owen was not responding to email. (See Testimony of Robert Keenum, supra.)

Lawyer Sanctions: (a) the absence of a prior disciplinary record; (b) the absence of a dishonest or selfish motive; (c) cooperative attitude with not only this tribunal but the United States Attorney's Office and the FBI; (d) good character; (e) good reputation in the community; and (f) remorse. The Court finds all of these factors present.

The Court, however, finds the following aggravating factors listed in Standard 9.2 against Mr. Hawk: (a) refusal to acknowledge wrongful nature of conduct; (b) vulnerability of victim; (c) substantial experience in the practice of law; and (d) indifference to making restitution. Here, Mr. Hawk has substantial experience in the practice of law, and he would readily admit that many of the client-victims were extremely vulnerable (one need only consider Brenda Barrette's payment to her medical providers using her retirement funds).

Importantly, the Court cannot reconcile that while Mr. Hawk appears remorseful and even takes pride in having made full restitution to the client-victims on the back of a difficult time in figuring out exactly how the fraudulent schemes were perpetrated and how much the clients were defrauded, it took Mr. Hawk until the Show Cause Order of September 3, 2015, to implement a genuine effort toward restitution. The Court does not necessarily find that Mr. Hawk has *refused* to acknowledge his conduct, but he has

routinely failed to treat the situation with an appropriate sense of urgency. Mr. Hawk's deflection of his responsibility by awaiting potential recovery from other sources or until he felt he had "saved" enough shows an indifference that the Court cannot condone, especially knowing his firm grossed $1.9 million in 2013.[22] At the sentencing hearing in June 2015, years after the Owen theft was discovered, Mr. Hawk represented that he hoped to make full restitution in the "next year or two." Yet, at the entry of the Show Cause Order restitution suddenly became easier and was accomplished within 45 days. The Court concludes that only then did restitution truly become an obligation to Mr. Hawk. The focused energy on restitution made by Mr. Hawk starting on September 3rd should have been exhibited much earlier and continually until full restitution was made.

As stated previously, the Court finds that Mr. Hawk's violation of Rule 1.15(I)(b) and 5.3(a) and (b) was at least grossly negligent. If the Court were to follow Professor

---

[22] The financial records received by the Court relating to the VHLF affirm the Court's perception that Victor Hawk is successful to a degree that full restitution could have been made more promptly following discovery of the fraud. The Court has no further use for the financial records and they would add nothing of substance to the record of this case; the Clerk is directed to return the financial records disclosed as a result of this Court's March 23, 2016 Order **to the confidential attention of Mr. Thomas W. Tucker,** Mr. Hawk's counsel of record. The Clerk shall also return the exhibits from the show cause hearing to Mr. Tucker for safekeeping.

Longan's methodology, wherein the lawyer's culpability determines the sanction to be imposed, the appropriate sanction in this case would be suspension. This is only the starting point though. In balancing the mitigating and aggravating circumstances, however, the Court is reluctant to press Mr. Hawk's sanction to this extent. The mitigating factors identified above weigh quite heavily in Mr. Hawk's favor, particularly in recognition that in Mr. Hawk's considerable experience before this bar, he has always been a man of good reputation, strong character, and conscientious representation. Moreover, what is not lost on this Court is the personal impact this entire event has had upon Mr. Hawk, his law firm and its staff, and his family, through the artifice of someone that he trusted and treated as family. Mr. Hawk's anguish was readily apparent in his testimony at the Richard Owen sentencing proceeding. And while his claimed remorse is diminished by the length of time that he took to make full restitution, the Court nevertheless finds that Mr. Hawk is genuinely contrite.

In conclusion, the mitigating factors in this case outweigh the aggravating circumstances to an extent that this Court will not suspend Mr. Hawk from the practice of law in this district. Rather, a public reprimand is sufficient and appropriate. See ABA Standards for Imposing Lawyer Sanctions,

Chapter III.A., § 1.2 ("[L]awyer discipline should be public, and disposition of lawyer discipline should be public in cases of disbarment, suspension, and reprimand. Only in cases of minor misconduct, when there is little or no injury to a client, the public, the legal system, or the profession, and when there is little likelihood of repetition by the lawyer, should private discipline be imposed.").

**B.  Melissa Detchemendy**

As an associate in the law firm, the only question before the Court as to Ms. Detchemendy's culpability is whether her supervision of Mr. Owen was sufficient to find that she violated Rule 5.3(b). Mr. Hawk testified that only he had supervisory authority over Mr. Owen.  Ms. Detchemendy's testimony, however, intimates that she had more authority than Mr. Hawk concedes.  Ms. Detchemendy testified that she counseled Mr. Owen when he was rude to the client and that he took direction from her in answering the phones.  She also referred to the trust account and the account statements in a way that implies that she was apprised of its status. Nevertheless, the evidence is insufficient to demonstrate that Ms. Detchemendy was in a position of authority over Mr. Owen to warrant imposition of sanctions against her under Rule 5.3(b).  The Court expects that this entire matter will serve as a cautionary tale to her.

### III.  CONCLUSION

Mr. Victor Hawk violated the rules of professional conduct in failing to effect measures giving reasonable assurances that the conduct of his employee, Richard Lee Owen, was compatible with his professional obligations and in his grossly negligent failure to supervise Mr. Owen.  See Rule 5.3 of the Georgia Rules of Professional conduct, Bar Rule 4-102(d).  Mr. Hawk also failed to adequately safeguard the settlement funds of his clients and the interests of medical providers.  See Rule 1.15(I)(b) of the Georgia Rules of Professional conduct, Bar Rule 4-102(d).

Upon this finding, **IT IS ORDERED** that Mr. Victor Hawk is hereby **PUBLICLY REPRIMANDED** for the conduct described above.  The Clerk is directed to **UNSEAL** the captioned matter.

**ORDER ENTERED** at Augusta, Georgia, this 6th day of December, 2016.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA

HONORABLE DUDLEY H. BOWEN, JR.
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA